NIKAS et al. v. UNITED CONST. CO. et al.—239 S. W. (2d) 41.

Western Section. Jackson. May 24, 1950.

Petition for Certiorari denied by Supreme Court, October 9, 1950.

437

John T. Shea, Harry Pierotti, Leonard D. Pierotti, all of Memphis, for appellants.

Albert Bernstein and Abe L. Roberts, both of Memphis, for appellees.

J. E. McCadden, of Memphis, for Ketchum & Hammond.

SWEPSTON, J. This appeal involves the rights and obligations of the respective owners of contiguous lots arising out of a party wall agreement.

Complainants, Nikas and wife, own a lot at the southwest corner of Main and Pontotoc Streets, Memphis, fronting 44 feet on Main and running 110 feet along Pontotoc, on which is situated a three-story brick building and basement formerly known as the Longinotti Hotel and now as the Manhattan.

Defendant Liberto and wife own the next lot to the south which fronts on Main Street 56 feet and runs back 110 feet west to the alley behind both properties.

The predecessors in title of the respective owners entered into a party wall agreement as follows:

"This agreement made this 30th day of May, 1895, by and between James Longinotti and August Longinotti of Water Valley in the State of Mississippi, of the one part, and Mrs. Lizzie Yeager Lee, of Memphis, Tennessee, of the other part,

"Witnesseth:

"That whereas the said James Longinotti and August Longinotti are the owners of a lot of ground 44 feet front on the west side of Main Street by 110 feet back west to a private alley 15 feet wide, Memphis, Tennessee, being the same conveyed to them by Stacker S. Lee and the said Mrs. Lizzie Yeager Lee, his wife, by the deed to be found of record in the office of the Register of Shelby County, Tennessee, in Book 185, Page 36; and the said James Longinotti and August Longinotti are about to erect a building on the said ground forty four feet front on Main Street, and running back along Pontotoc Street the same width, ninety feet, such building to be of brick and to have a basement and be three stories high above the ground.

"And whereas the wall of said building is to be 22 inches and it is desirable that the same should be located equally on the ground belonging to the said James Longinotti and August Longinotti before described, and that lying immediately south of it, which belongs to the said Mrs. Lizzie Yeager Lee as the devisee under the will of said Stacker Lee, which is of record in the office of the Clerk of the Probate Court of Shelby County, Tennessee, and all the said parties agree that the said wall shall be so located.

"Now this agreement witness, that the parties hereto hereby consent and agree that the said James Longinotti and August Longinotti shall locate and build half the said wall upon the said ground so belonging to the said Mrs. Lizzie Yeager Lee, and do the excavation and other work necessary in that behalf, the said wall to remain there permanently as a part of the said house, and that the same shall be subject to be used and appropriated by the said Mrs. Lizzie Yeager Lee as the wall of and

for the use of such buildings or improvements as she or those claiming under her may erect on the ground aforesaid now belonging to her, and that when the said wall is so used and appropriated by the said Mrs. Lizzie Yeager Lee (or those claiming under her) she or they shall pay to the said James Longinotti and August Longinotti, or their assigns, the one-half of the value of the said wall at the time the same is so used and appropriated and that such payment, so to be made shall be a full compensation for the said one-half of the said wall and shall vest in the said Mrs. Lizzie Yeager Lee or those claiming under her the full and complete title thereto.

"Done in duplicate this day and year above written.

> "/s/ Mrs. Lizzie Yeager Lee
> "James Longinotti
> "A. Longinotti"

Pursuant to said agreement, the existing building was erected with the south wall twenty two inches thick at ground level resting half on each lot.

Omitting for the present intervening matters, after defendants acquired their lot, they began construction of a building on it and tied into the south side of the party wall for the north wall of their building, all without notice to complainants.

This suit was then filed to enforce payment for one-half the present value of the party wall.

Omitting certain steps not now relevant, defendants answered that in the year 1900 Joseph A. Bailey and George E. Witt, one of their predecessors in title, erected on said lot a one story building in which they used and appropriated said party wall as their north wall, attaching to same the supporting rafters and roof and using the chimneys built into said wall, which building remained unaltered until demolished in 1940.

Further, that said party wall agreement was not registered until 1905 and that Bailey et al. had no knowledge of same and were not liable to pay for the use of said wall on their property. They, therefore, set up the following defenses:

1. The nonliability of Bailey inures to defendants;

2. Presumption of payment by Bailey after the lapse of 47 years;

3. Ten year statute of limitations;

4. Laches and estoppel by reason of the death of witnesses and by conduct of complainants' predecessors in title;

5. The agreement was a covenant personal to the parties and not binding upon defendants, nor inuring to the benefit of complainants;

6. Only Bailey and Witt were liable and not any subsequent grantee of theirs.

Defendants then filed a cross-bill bringing in Ketchum et al., their grantors, to recover for breach of covenant of general warranty, in event defendants be cast in complainants' suit.

Ketchum et al. answered that cross-complainants are charged with notice of the alleged encumbrance and that the wall having been used by defendants is a benefit instead of a burden; hence, no liability.

The cause was heard regularly on oral testimony by order (R. 45) of the Chancellor who filed an elaborate written findings of fact and opinion (R. 46-71) which we do not abstract as to all points, for the reason that we are of opinion there is error in one determinative finding of fact.

The Chancellor found (R. 51 and 61) that Joseph A. Bailey asserted he was not using and appropriating said party wall within the sense of the said agreement; hence,

since Bailey was and would be estopped to say later that he was using it, his successors in title would be estopped (R. 62).

No fault can be found with his conclusion of law, but we do not think the record sustains the factual major premise.

The only testimony on the point is that of Will Longinotti, son of August and nephew of James, who executed the agreement with Mrs. Lee. He was 16 at the time the Bailey building was constructed in 1900.

As to Bailey it will be observed that witness never talked to Bailey, his father did not state what Bailey's attitude was, and it does not appear that anybody talked to Bailey.

The testimony is:

"Q. Did you ever discuss that with your father? A. No sir, only once I asked him after I read the agreement did he ever try to collect on the wall from Bailey and he said no, he didn't want to go into court or have a law suit about it.

"Q. Did he say the people who owned the other building had refused to pay? A. He didn't say.

"Q. Did he say why he didn't go to court about it? A. Well, he said there was some question about whether they were using the wall. He said it would cause a law suit." (R. 94.)

"Q. When you went back you spoke to your father about it? A. That is right.

"Q. You considered the wall was being used by Bailey? A. I thought so, yes sir.

"Q. You thought so? A. Yes.

"Q. You spoke to your father and his response was it might cause a law suit to collect and he didn't want to have any trouble or law suit? A. Yes sir.

"Q. He said, 'Well, there might be a law suit to collect on it and I don't want to have any trouble.' Those were almost his exact words? A. Yes sir." (R. 96.)

"Q. Did one of those gentlemen living at time give any reason for not paying for the wall, do you recall? A. I was telling you about a conversation I had with my father. He said he didn't want a law suit.

"Q. Didn't your father state what Mr. Bailey's position was? A. No sir.

"Mr. Shea: We object to his leading.

"The Court: Restate the question.

"Q. Did your father state in that conversation or any other conversation (interrupted).

"Mr. Shea: We object to that, your Honor.

"The Court: On what ground?

"Mr. Shea: He is asking him 'Did your father state in that conversation?'

"The Court: Re-phrase your question.

"Q. Mr. Longinotti, what did your father state you said there was a conversation what did he state about what Mr. Bailey or any of the others might have said to him as their reason for not paying for it? A. I asked him why they didn't pay him and he said he—said there was some talk about they weren't using the wall. He said he figured there would be a lawsuit and he didn't want a lawsuit." (R. 101-102.)

The witness himself said he thought Bailey had appropriated his side of the wall; it appears that his father thought so, but did not want a lawsuit about it. It is fair to infer from the attitude of the father (1) that he knew the agreement was not then of record, (2) that Bailey did not know about the unrecorded agreement, (3) if demand were made on Bailey for payment, he would have stood on his lack of actual knowledge and

(4) that by reason of the father's reluctance to have a lawsuit he said nothing to Bailey. There is reason to infer, therefore, that whatever talk there was about a lawsuit was between the Longinottis and not with Bailey.

The only other evidence that could by any possibility be used even to suggest Bailey's attitude is this same witness' testimony (R. 91) that the roof of the Bailey building was supported by wooden columns 8 x 8, or 10 x 10, along the wall, but not attached to it and that the roof joists did not rest on the corbel or shelf that extended out about 6 inches from the rest of the wall but rested only on the wooden columns, but, as we shall later demonstrate, Mr. Longinotti's memory was erroneous and there were no wooden columns along the wall, but only in the center of the building running parallel to the north and south walls.

In our view there is, therefore, no evidence either direct or circumstantial, from which it could be found that Bailey asserted that he was not using the party wall; hence, there could be no estoppel of Bailey and his successors in title.

Much of the evidence and the briefs are directed at whether the Bailey building was a substantial building that would amount to a use and appropriation of the party wall within the sense of the agreement. The Chancellor, being of the opinion that estoppel lay against Bailey and his successors, put his decision on that ground and made no specific finding as to the present question.

We deem it necessary to make a finding on the point.

First, by way of clarifying the picture, pursuant to the customary method of construction of party walls and of the type of construction generally in that era and within the spirit of the agreement the south side of the party wall had built into it at the second and third floor levels

and the roof level a horizontal shelf extending the full length of the building, on which a builder on the Lee lot could rest the ends of the floor or roof joists as the case might be. This structure is called a corbel; it is any bracket extending from the face of the wall either for ornamental or support purposes—here obviously for support. These extended out about 6 inches.

The Chancellor thought the evidence doubtful that there was a substantial use and appropriation of the wall by Bailey. There is some slight conflict in the evidence but we do not think there is any doubt about the decided weight of it.

There is only one eyewitness to the kind of building Bailey put up. There are many who either rented it or visited it after about 1916 and up until it was demolished in 1938. All of the original parties to the agreement are dead; also the contractor who demolished it.

True that defendant said it was a ''kind of a shack, a real small building, more like a shed'', but the point is to what extent was the party wall used.

Of one thing there is no possible doubt—the roof of the Bailey building was flashed to the party wall. Exhibits 3 and 4, photographs, taken recently show this plainly. The tar mark begins at the front about three feet above the lowest corbel and slopes downward toward the west or rear until it is only about six inches above the corbel, thus showing the roof line. Ample testimony also supports the fact.

Witness Levine, a graduate engineer, and a building contractor by vocation, says that it is flashed and counter-flashed, which simply means that a layer of metal or other waterproof material is lapped over the edge of the roof planks and upward against the wall-flashing, and then another layer inserted into the wall a few inches

above the first and brought down to overlap the upper edge of the first layer—counterflashing, with cement or asphalt sealing the edges to wall and roof.

Most of the witnesses agree that it had brick walls on the other three sides and that the chimney in the western part of the wall was used by occupants and that there was no ceiling below the roof.

There was a concrete floor running from the party wall south about 35 feet the full depth of the building. Will Longinotti says it had some concrete running from the south wall, but it was not fully concreted until about 1922, before which time the concrete, he says, did not touch the party wall. We think he is mistaken about it just as about the big wooden support timbers.

If there was no concrete floor in the beginning against the party wall, then the wooden timbers would have had to rest either on the ground or on some more solid footing. Then if the concrete floor was put down later, there should have been some evidence of the wooden supports being surrounded by the newer floor either by way of holes where the posts went through, or by joints between the old footing and the newer surrounding floor. Yet there is no such evidence; the floor there appears perfectly smooth and homogeneous.

Furthermore, Longinotti says that there was never any change in the structure of the building other than the type of floor. Elmer Harris, a rental agent and realtor, had charge of the building from 1916 until it was demolished in 1938. Harris says it was all concrete when he first saw it and they never put down any more, although Longinotti says the additional concrete was put down when Chambers Motor Co. rented it in 1922.

Now, several witnesses testify that there were not in later years from about 1916 to 1938 any wooden supports

along the party wall,—Elmer Harris, Ira Wells and others. Wells, age 75, worked in the building as a cabinet maker; one time he put a roof on the building; he says that he saw the roof joists resting on the corbel, that the only wooden posts were those down the center of the building, that the roof was flashed to the party wall and that there was plaster on the wall. All saw posts down the center of the building.

Finally as to the wooden posts, besides the testimony of several witnesses who saw no posts, or evidence of same, along the party wall, we have the point made by Levine, the contractor, that on account of the corbel protruding the posts, if set straight, would have to be at least six inches from the party wall, which would leave the edge of the roof boards without support at the wall. He says this is possible, but hardly probable that anyone would use such construction, for obvious reasons.

As to whether the wall was plastered, several witnesses so testified. Longinotti on direct said not, but when confronted with a letter his brother Ed Longinotti, an official of the Union Planters Bank, had written Elmer Harris in 1938 shortly after the demolition of the Bailey building, which letter was based solely on a written memorandum Will had handed him, he admitted his statement in 1938 probably reflected the fact. The letter complained to Harris that in razing the building the contractor had left roof flashing and some plaster in bad shape on the south side of the wall. (R. 190 and Ex. 5 and 20.) Harris testified that he ordered it removed.

Incidentally, it is argued that because in the above letter Ed Longinotti said "our wall", the Longinotti Estate was still claiming to own all of the party wall, because they had never been paid for the half on the adjoining lot. There is no merit in this—the law of

party walls is too obstruse for a layman to be bound by any such casual phraseology.

■ We conclude this point. The Bailey building was not "a thing of beauty and a joy forever"; it was a shed type structure simply because it was not ceiled, but it had four brick walls, a roof and a concrete floor and was in use for 38 years; the party wall agreement does not even suggest the type of building that Mrs. Lee or any of her successive assigns might be expected to build. Provision was made in the wall so that they might build anything from one to three stories against this wall. A one story building was put there by Bailey and Witt and the decided weight of the evidence shows that substantial use was made of the wall. It was in our opinion a use and appropriation within the sense of the agreement.

Therefore, by the express terms of the agreement Bailey and Witt became liable for contribution of half the then value of the wall, unless, as defendants now claim, that Bailey was an innocent purchaser because the agreement had not then been registered; and further that defendants being purchasers in succession from an innocent purchaser are entitled to the same immunity from liability, even though the party wall agreement having been registered before defendants purchased would otherwise have been constructive notice to defendants.

■ As the rule of constructive notice is applied in this State, Bailey could not have been an innocent purchaser. The south wall of the hotel was plainly over the line eleven inches when Bailey purchased.

■■ In Macon v. Sheppard, 21 Tenn. 335, where one acre was occupied by a church regularly used the congregation had been promised a deed but same had never

448

been executed. A vendee of the entire tract of which this was a part claimed he had no notice. The Court: "And it is settled that if a person purchase an estate from the owner, knowing it to be in possession of tenants, he is bound to enquire into their estates, *and is affected with notice of all the facts in relation thereto.*"

In Jarman v. Farley, 75 Tenn. 141, 144: "there can be no innocent purchaser of land from a vendor who was out of possession at the date of conveyance . . ."

Walgreen Co. v. Walton, 16 Tenn. App. 213, 221, 64 S. W. (2d) 44, 48: "Where the lessee *is* in possession, the purchaser takes subject to the lease."

In Williams v. Title Guaranty & Trust Co., Tenn. App., 212 S. W. (2d) 897, 901, referring to the notice: "It need not contain complete information of every fact material for the purchaser to know."

■ Hence, since defendants' predecessor was not an innocent purchaser, defendants cannot rely on the rule that a subsequent purchaser even with notice from a bona fide purchaser has the benefit of that status.

By perhaps the greater weight of authority this sort of an agreement is a covenant running with the land available to and binding on the successors in title of the adjoining properties. Thompson on Real Property, Secs. 571 and 3426.

Under the facts as we have found them Bailey and Witt first used and appropriated the wall on the south side and so became personally liable to Longinotti. But the proof is that Longinotti never received payment. Then after the building had stood for 38 years it was razed. Then the lot passed to Ketchum and Hammond and then to defendants.

The question arises whether the defendants are liable to contribute under these facts.

 First, we think that the evidence we have quoted, supra, coupled with the lapse of over 30 years that either of the Longinotti brothers could have filed suit to collect from the Baileys, shows clearly that Longinotti waived his right to contribution.

He had full knowledge of his rights under the agreement and of the use made by Bailey of the wall, his attention was called to it by his son Will, there was discussion among some of the family, but never any attempt to discuss it with Bailey or to negotiate with him. If he was in doubt of the extent of the use he could have had the doubt resolved, but he did nothing except to take the positive stand that he would not have a lawsuit.

This positive stand coupled with long delay, laches, is a clear abandonment or waiver. See cases cited in Prewitt v. Bunch, 101 Tenn. 723, 742, 50 S. W. 748.

We think the Gentry case, Gentry v. Gentry, 1 Tenn. 87, cited therein is easily distinguishable on the facts.

 Complainants are bound by the conduct of their predecessor in title and under the contract.

In the absence of the above facts showing an abandonment by Longinotti of the claim, liability might be claimed by complainants on the theory of an equitable lien hovering over the land, as he held by some courts, of which a subsequent purchaser has either actual or constructive notice. 40 Am. Jur. 512, Sec. 40.

But we think that if such rule be applied, the suit would be barred by the ten year statute of limitations, Code Section 8601, covering all actions, real or otherwise, not otherwise provided for. City of Knoxville v. Gervin, 169 Tenn. 532, 89 S. W. (2d) 348, 103 A. L. R. 877. (Suit to enforce lien for front foot assessment.)

Lawman v. Barnett, 180 Tenn. 546, 177 S. W. (2d) 121, 153 A. L. R. 772.

Of course, this suit was filed to recover for defendants use of the wall, whereas we have been discussing the use made by Bailey.

 The cases are rather in accord on the point that when the wall has once been used and paid for, a subsequent grantee is not liable for continued use of same. We see no difference where the builder of the wall has waived or abandoned his claim instead of receiving actual payment. (See above authorities.)

We find it unnecessary to discuss other defenses made or matters raised by the cross-bill.

We sustain the relevant assignments of error, and reverse the decree and dismiss the bill and cross-bill at the costs of complainants.

Anderson, P. J., and Baptist, J., concur.